**Western Pennsylvania National Bank,<br>Appellant, *v.* Myers.**

Argued March 19, 1962.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Philip Baskin,* with him *Robert L. Rubendall,* and
*Baskin and Baskin,* and *Hull, Leiby & Metzger,* for ap-
pellant.

*Earl F. Reed,* with him *Louis Caplan,* and *Thorp,
Reed & Armstrong,* for appellee.

*Frederic G. Antoun,* Deputy Attorney General, with him *Richard Woodcock,* Assistant Attorney General, and *David Stahl,* Attorney General, for Secretary of Banking and Secretary of Commonwealth, appellees.

OPINION BY MR. CHIEF JUSTICE BELL, May 3, 1962:

Did the Department of Banking clearly abuse its discretion in approving the Articles of Incorporation for Commercial Bank & Trust Company of Pittsburgh? This appeal is in the nature of a broad certiorari: *Dauphin Deposit Trust Company v. Myers,* 401 Pa. 230, 164 A. 2d 86, and cases therein cited. See also *Philadelphia Saving Fund Society v. Myers,* 406 Pa. 438, 179 A. 2d 209.

Section 306 of the Banking Code prescribes the procedures to be followed and the factors to be considered by the Department in approving or disapproving Articles of Incorporation of institutions. Section 306 of the Banking Code* pertinently provides:

"A. The Department of Banking shall, immediately upon the receipt of the articles from the Department of State, conduct such investigation as it may deem necessary to ascertain from the best sources of information at its command:

"(1) Whether the name of the proposed incorporated institution is likely to mislead the public as to its character or purpose.

"(2) Whether the convenience and advantage of the public will be served by the proposed incorporation *and whether the density of the population in the neighborhood* designated for the place of business of such proposed incorporated institution *and in the surrounding country*** affords reasonable promise of adequate support for the enterprise.

---

* May 15, 1933, P. L. 624.
** Italics throughout, ours.

"(3) Whether the responsibility, character, and general fitness for the business of the incorporators, directors and officers named in the articles are such as to command the confidence of the community and to warrant the belief that the business of the proposed incorporated institution will be honestly and efficiently conducted in accordance with the intent and purpose of this act. . . ."

Articles of Incorporation for Commercial Bank & Trust Company of Pittsburgh,* Allegheny County, Pennsylvania, were filed with the Department of State on October 6, 1961 and forwarded to the Department of Banking. The Articles were approved by the Department on December 8, 1961 and returned to the Department of State.

The Department of Banking in accordance with the aforesaid requirements of the Banking Code caused an investigation of the application to be made by its staff. Objections to the approval of the Articles were made by M. A. Cancelliere, President of Western Pennsylvania National Bank.

Although not required to do so, the Department at his request wisely held hearings. The testimony taken at the hearings, the files of the Department, including the Articles of Incorporation, the investigation report, and other pertinent materials, were made a part of the record.

We shall briefly summarize the report of the Department of Banking.

"The first factor required to be considered is '(1) Whether the name of the proposed incorporated institution is likely to mislead the public as to its character or purpose.'

". . . The Department finds that the name of the proposed institution is a proper name and will not mislead the public as to its character or purpose.

---

* With capital and surplus of $5,000,000.

"The second factor to be considered is '(2) Whether the convenience and advantage of the public will be served by the proposed incorporation and whether the density of the population in *the neighborhood* designated for the place of business [and in the surrounding country] affords reasonable promise of adequate support for the enterprise.'

"The Department finds that the convenience and advantage of the public will be served by the chartering of the proposed bank and that the Pittsburgh-Allegheny County area in which it proposes to conduct its business will adequately support the new institution. Pittsburgh is the second largest city in the Commonwealth. It is the center of an active and important business and industrial community. There are presently 13 banks of deposit, including a mutual savings bank, which maintains their principal offices in the City of Pittsburgh. The total volume of deposits held by these banks as of June 30, 1961 was $3,276,977,000. The total volume of loans was $1,691,321,000. The *largest* of the Pittsburgh banks held 57.165% of the deposits and 56.648% of the loans. The *second largest* Pittsburgh bank had 25.520% of the deposits and 25.024% of the loans.* . . .

"The ratio of bank deposits to population in the City is $5,415,000 per 1,000 of population and in the County $2,285,000 per 1,000 population.

"These statistics in themselves are not significant. However, in contrast with similar statistics for Philadelphia, the largest metropolitan area of the State, they are significant. The 20 banks of deposit, includ-

---

* In 1940 Pittsburgh had 40 different institutions from which people could choose to do their banking business. In 1950 the people of Pittsburgh had 26 separate banking institutions with which they could choose to do business. Today, because of mergers and consolidations there are only thirteen banking institutions including one Mutual Savings Bank.

ing 4 mutual savings banks, in Philadelphia have aggregate deposits of $6,280,769,000 and loans of $3,628,248,-000. The largest bank has 18.15% of the deposits and 19.265% of the loans. The corresponding ratios for the next three banks are as follows: Deposits 17.65%, 16.06% and 10.85% and loans 16.13%, 15.188% and 11.571%. The ratio of deposits to population in Philadelphia is $3,137,000 per 1,000 persons.

"The data submitted to the Department by the Incorporators with respect to the prospective business of the new institution indicates that the bank will attract a sufficient volume of business to justify its incorporation. The Incorporators, who are business and professional men of the Pittsburgh community, believe so strongly in the future of the bank that they propose to start with capital accounts in excess of $5,000,000.

"The relatively high concentration of deposits and loans in Pittsburgh and Allegheny County in two banks* indicates the convenience and advantage to the public of additional deposit and credit facilities to be supplied by the new institution. In his testimony in this matter, Mr. Cancelliere stated: 'Nor do I object to the proposed entry of additional banks into metropolitan Pittsburgh for I firmly believe that *Pittsburgh needs and should have expanded banking facilities.*' It is significant too that Western Pennsylvania National Bank applied for authority to establish its sixth branch banking office in the City of Pittsburgh at a location approximately *one block* from the proposed office of Commercial Bank & Trust Company. . . .

"The principal objections to the chartering of the proposed bank presented by Mr. Cancelliere are that the proposed bank:

"'. . .

---

* The two largest banks in Pittsburgh had over 82% of the deposits and approximately the same percentage of the loans.

" 'Will result in undue competition to existing bank‹ ing facilities which result will not serve to strengthen the dual banking system nor work to the benefit of the public which this system seeks to serve.'

". . . The Department finds that the introduction of the proposed bank in the Pittsburgh-Allegheny County community *will not weaken the banks presently operating in that area. On the contrary, it appears clear that the volume of available banking business there can well support the proposed bank in addition to those presently in existence.* It cannot be denied that the establishment of the new bank will have some adverse effect upon the banks with which it will compete. That is always one of the results of the introduction of new competing business units into a restricted market. In the banking field one of the purposes of bank supervision is to limit the creation of new units where such competition may be so great as to unduly injure and weaken the existing banks. However, in the instant case, it does not appear that any existing bank will be unduly injured.

. . .

"It is also charged specifically that Mr. Halpern is an unfit person to organize and operate the proposed bank. [The Department then analyzed and reviewed at length Halpern's qualifications and fitness and found them to be satisfactory.]

. . .

"For the reasons hereinbefore set forth [at length], the Articles of Incorporation of Commercial Bank & Trust Company of Pittsburgh are approved. ROBERT L. MYERS, JR., Secretary of Banking."

Appellant contends that its proposed branch bank (approximately one block from the proposed new bank) will attract $2,000,000 of deposits and is both wise and necessary, but a larger bank will not only take away their business but seriously injure them. Whenever a

new bank or a new branch comes into a community, like a new store coming into a community, the existing institutions are likely to suffer a decrease in their business. However, this is not the appropriate test.

This Court aptly said in *Dauphin Deposit Trust Co. v. Myers*, 401 Pa. 230, 164 A. 2d 86 (pp. 241-242) : "As we stated in Delaware County National Bank v. Campbell, 378 Pa. 311, 314, 325, 106 A. 2d 416 : 'The Department of Banking was created not to manage or operate a bank but to supervise a bank, and to be a watchdog in the interests of depositors, creditors, shareholders and of the community in general . . . Part of the powers and duties of the Department of Banking . . . is to determine . . . *whether* the community served and from which a bank draws its depositors and clients *has adequate banking facilities and is not overbanked . . .". . .* the clear intention of the statute in regard to establishment of branches, both by new branch and by merger, is the same : *to guard against 'overbanking' on the one hand, and 'underbanking' on the other; . . .".* The legislature . . . *did not exclude or intend to exclude competition between banks; it intended, inter alia, to exclude such competition as would likely weaken or destroy some banks* in an overbanked community and thus weaken or injure the entire banking system, to the detriment of depositors, creditors, stockholders and the public alike.' " See also *Philadelphia Saving Fund Society v. Myers*, 406 Pa. 438, 449, 179 A. 2d 209.

Appellant's basic contentions are two-fold. (1) The density of population in the neighborhood* designated for the place of business of such proposed bank must separately afford reasonable promise of adequate sup-

---

* Appellant fixes the neighborhood as an area of approximately two miles. The "neighborhood" cannot be precisely fixed by metes and bounds or by precise geographical dimensions, or by political subdivisions or areas. Cf. *Upper Darby National Bank v. Myers*, 386 Pa. 12, 124 A. 2d 116.

port, and the density of population in the surrounding country must likewise separately afford reasonable promise of adequate support for the proposed bank. This contention is based upon an incorrect interpretation of Section 306, which does not require the reasonable promise of adequate support in the neighborhood and in the country separately, but only in the neighborhood and the surrounding country *as a whole*.

Appellant's second contention is that the Department must find a *need* for the $5,000,000 new bank *in the neighborhood*. This is a strange contention, considering the fact that appellant both by its application and its testimony admits that there is a need for a $2,-000,000 branch bank in the neighborhood. Appellant draws a distinction between a new bank and a branch bank especially where as here the new bank is large, since in such a case it will result in ruinous competition and weaken the entire banking structure. The test for a new bank and for a branch bank is somewhat different. The test for a new bank has been hereinabove set forth; the test for a branch bank is "need for the proposed services or facilities" and without any provision or reference to "density of population". See Section 204.1 of the Banking Code and *Dauphin Deposit Trust Company v. Myers,* 401 Pa., supra.

The real answer to the second contention of appellant will be found in *Philadelphia Saving Fund Society v. Myers,* 406 Pa., supra (pp. 449 and 450) : "In Delaware County National Bank v. Campbell, 378 Pa., supra, we said, pp. 315, 328: '. . . The Board is composed of experienced and able bankers who should know, if anyone knows, the banking needs of the various communities in Pennsylvania and whether adequate banking facilities do or do not exist. . . .

"Where a Board is composed of able and experienced experts who are dealing with technical questions, a Court should be loath to find a clear abuse of discre-

tion upon a subject or subjects as to which they are far better qualified than any Court." See also to the same effect *Dauphin Deposit Trust Company v. Myers,* 401 Pa., supra, page 236.

We find no merit in any of appellant's contentions. Order affirmed.